# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| AEROTEK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:17CV2469 HEA |
| | ) | |
| JOEL T. MURPHY and BEACON HILL | ) | |
| STAFFING GROUP, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## **OPINION, MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, [Doc. No. 2]. On October 5, 2017, the Court held a hearing on this matter, at which both parties were represented by counsel. Arguments were presented at that time. For the reasons set forth below, Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction is denied.

## **Facts and Background[1]**

This is an action alleging unlawful conduct by Aerotek's former employee, Murphy, and his current employer, Beacon Hill. Aerotek alleges violation of Murphy's employment agreement and under Missouri law. Plaintiff further alleges

---

[1] Because the Complaint is not verified, the recitation of facts taken from the Complaint is set out for the purposes of this motion only and in no way relieves the parties of the necessary proof thereof in later proceedings.

Beacon Hill has tortuously interfered and is continuing to tortuously interfere with Murphy's employment agreement through its continued employment of Murphy.

Aerotek is a Maryland corporation with its principal place of business located in the State of Maryland. Aerotek is registered to do business in Missouri and maintains an office in St. Louis. Murphy is a Missouri citizen. Murphy was an Aerotek employee from October 21, 2014 until his termination for cause on July 19, 2017. Beacon Hill is a limited liability company organized under the laws of the State of Massachusetts. Its headquarters and principal place of business are located at 152 Bowdoin Street, Boston, Massachusetts 02108.

Aerotek and Defendants are citizens of different states. The amount in controversy is in excess of $75,000, exclusive of interest and costs, including, but not limited to, that the value to Aerotek of the injunctive relief sought exceeds $75,000, based on the amount of business at issue if Defendants are permitted to continue their current course of conduct. Subject matter jurisdiction is therefore proper under 28 U.S.C. § 1332(a).

Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred or is occurring in this district.

Aerotek is engaged in the business of recruiting, employing and providing the services of personnel on a temporary or permanent basis to companies

throughout the United States, and in the St. Louis, Missouri area, in particular. Aerotek invested, and continues to invest, considerable resources to develop information, methods, and techniques to: (a) identify entities that utilize professional placement services to fill staffing needs; (b) identify the key individuals responsible for recruitment of professional employees within those entities; (c) maintain, develop and nurture business relationships with those entities and individuals; (d) learn clients' business and staffing needs; (e) develop innovative solutions to meet clients' staffing needs; (f) develop, screen, and maintain highly-qualified candidates for placement with its clients; and (g) set appropriate pricing to attract and maintain clients. Plaintiff contends this information is valuable, confidential, and proprietary to Aerotek, and is not generally known in the public domain.

Individuals employed by Aerotek who are involved in the recruitment of potential candidates and placement, *inter alia*, become inexorably and intimately knowledgeable regarding Aerotek's clients, financial information regarding its clients' rates, its contacts for those clients, its clients' needs, and the candidates Aerotek has or may have to fill those needs. This information has significant economic value to Aerotek and would be of significant economic value to competitors in the professional recruitment and placement industry.

To protect its legitimate business interests with respect to this information, Aerotek requires that the individuals it employs for the purpose of conducting professional recruitment and placement sign restrictive covenants and non-disclosure agreements as a condition of employment. Aerotek also maintains its client and candidate information in secure, password-protected databases.

On October 20, 2014, Aerotek hired Murphy for the position of Recruiter in its St. Louis, Missouri office. He was subsequently promoted to an Account Manager. At all times relevant to this matter, Murphy worked in Aerotek's St. Louis, Missouri office.

Prior to his employment with Aerotek, Murphy had no knowledge of Aerotek's confidential information or trade secrets, *i.e.*, the identity of Aerotek's clients, its contacts for those clients, pricing for various clients, its clients' needs and the data bank of information regarding potential candidates to fill positions. At the outset of his employment, Murphy received training from Aerotek related to his position as a Recruiter to learn information regarding Aerotek's confidential information. Thereafter, Murphy continued to receive training and gain knowledge of Aerotek' confidential information during his tenure with the company.

In executing his duties for Aerotek, Murphy had access to proprietary and confidential information, including but not limited to: Client Lists, Internal Employee Contracts, Client Service Agreements, Consultant Agreements, Road

Books (print-outs of all clients and contacts within territory), Siebel reports (sales and documentation information), Bill Rate information based on skills of consultants and clients, Burden Sheets, RWS Information (resume and information database for all candidates), Hot Books, Submittal Logs, and Phone Interview Sheets. Murphy also participated in meetings to discuss current and target accounts with other employees in the office where he worked, learning about opportunities with the accounts Aerotek was and is servicing.

During his employment with Aerotek, Murphy had a duty to, among other things, gain familiarity with candidates and clients; to evaluate them; maintain business relationships with existing clients; develop and maintain lists of candidates, clients and contacts; and work diligently to develop the business of Aerotek.

As an employee of Aerotek and through the use of Aerotek's resources, Murphy developed and maintained relationships with clients and candidates in Aerotek's database. Murphy's duties included creating goodwill for Aerotek through personal contacts and business relationships. In particular, Murphy developed and maintained strong business relationships with prospects and clients through cold-calling, directly meeting with them, and networking among industry associations. He also utilized a consultative approach to determine potential client needs and developed well-rounded business plans with optimal solutions, and

managed a team of recruiters and ensured they had an effective recruiting strategy to deliver on clients' tight deadlines.

As an employee of Aerotek and through the use of its resources, Murphy had access to and was exposed to the following confidential information: a. the identity of Aerotek's clients; b. the identity of the contact persons at Aerotek's clients who decide or have significant influence regarding which recruiting/ placement firm(s) they will use; c. the billing rates Aerotek charges each of its clients (which vary by client); d. the placement/recruitment history of Aerotek with clients and current/future staffing requirements; e. margin tolerances regarding prices including wage rates of contract employees; f. sales and marketing strategies, along with sales, recruiting, pricing and marketing techniques; g. the particular idiosyncrasies of each client/contact person including their preferences, likes, and dislikes regarding recruiting/placement; and h. the employment histories, qualifications, contact information, and preferences of candidates suitable to satisfy clients' requirements.

This information is not otherwise obtainable from public sources and constitutes confidential information and trade secrets.

On October 20, 2014, Murphy signed an Employment Agreement (the "Agreement") with Aerotek, which included non-compete, non-solicit and non-disclosure obligations. The Agreement provides, in relevant part, as follows:

**3. NON-COMPETE COVENANT:** EMPLOYEE agrees that upon the termination of EMPLOYEE's employment, whether by AEROTEK or EMPLOYEE and whether with or without cause, for a period of eighteen (18) months thereafter EMPLOYEE shall not directly or indirectly engage in or prepare to engage in, or be employed by, any business that is engaging in or preparing to engage in any aspect of AEROTEK's Business for which EMPLOYEE performed services or about which EMPLOYEE obtained Confidential Information during the two (2) year period preceding termination of EMPLOYEE's employment, within a radius of fifty (50) miles from the office in which EMPLOYEE worked at the time EMPLOYEE's employment terminated or any other office in which EMPLOYEE worked during the two (2) year period preceding termination of EMPLOYEE's employment. The prohibitions contained in this Paragraph shall extend to (i) activities undertaken by EMPLOYEE directly on EMPLOYEE's own behalf, and to (ii) activities undertaken by EMPLOYEE indirectly through any individual, corporation or entity which undertakes such prohibited activities with EMPLOYEE's assistance and in or with respect to which EMPLOYEE is an owner, officer, director, trustee, shareholder, creditor, employee, agent, partner or consultant or participates in some other capacity.

**4. NON-SOLICITATION COVENANT**: EMPLOYEE agrees that upon the termination of EMPLOYEE's employment, whether by AEROTEK or EMPLOYEE and whether with or without cause, for a period of eighteen (18) months thereafter EMPLOYEE shall not directly or indirectly:

> (a) Communicate with any individual, corporation or other entity which is a customer of AEROTEK and about which EMPLOYEE obtained Confidential Information or with which EMPLOYEE did business on AEROTEK's behalf during the two (2) year period preceding termination of EMPLOYEE's employment for the purpose of:
>> (i) entering into any business relationship with such customer if the business relationship is competitive with any aspect of AEROTEK's Business for which EMPLOYEE performed services or about which EMPLOYEE obtained Confidential Information during the two (2) year period preceding termination of EMPLOYEE's employment, or

(ii) reducing or eliminating the business such customer conducts with AEROTEK; or

(b) Communicate with any person who has been a Regular Employee within the two (2) year period preceding termination of EMPLOYEE's employment and about whom EMPLOYEE obtained knowledge or had contact by reason of EMPLOYEE's employment with AEROTEK for the purpose of:

(i) providing services to any individual, corporation or entity whose business is competitive with AEROTEK, or

(ii) leaving the employ of AEROTEK; or

(c) Communicate with any person who has been a Contract Employee within the two (2) year period preceding termination of EMPLOYEE's employment and about whom EMPLOYEE obtained knowledge or had contact by reason of EMPLOYEE's employment with AEROTEK for the purpose of:

(i) ceasing work for AEROTEK at customers of AEROTEK, or

(ii) refraining from beginning work for AEROTEK at customers of AEROTEK, or

(iii) providing services to any individual, corporation or entity whose business is competitive with AEROTEK.

As used in this Paragraph 4: "Regular Employee" means an employee of AEROTEK who is not a "Contract Employee"; and "Contract Employee" means an employee or candidate for employment of AEROTEK who is or was employed to perform services or solicited by EMPLOYEE to perform services at customers of AEROTEK.

The prohibitions contained in (a), (b) and (c) above shall extend to (i) activities undertaken by EMPLOYEE directly on EMPLOYEE's own behalf, and to (ii) activities undertaken by EMPLOYEE indirectly through any individual, corporation or entity which undertakes such prohibited activities with EMPLOYEE's assistance and in or with respect to which

> EMPLOYEE is an owner, officer, director, trustee, shareholder, creditor, employee, agent, partner or consultant or participates in some other capacity.

* * *

> **6. COVENANT NOT TO DIVULGE CONFIDENTIAL INFORMATION**: EMPLOYEE covenants and agrees that, except as required by the proper performance of EMPLOYEE's duties for AEROTEK, EMPLOYEE shall not use, disclose or divulge any Confidential Information of AEROTEK to any other person, entity or company besides AEROTEK. For purposes of this Agreement, "Confidential Information" shall mean information not generally known by AEROTEK's competitors or the general public concerning AEROTEK and that AEROTEK take reasonable measures to keep secret, including but not limited to: their financial affairs, sales and marketing strategy, acquisition plans, pricing and costs; their customers' names, addresses, telephone numbers, contact persons, staffing requirements, margin tolerances regarding pricing, and the names, addresses, telephones numbers, skill sets, availability and wage rates of its temporary or contract personnel; sales, recruiting, pricing and marketing techniques, sales and recruiting manuals, forms and processes for acquiring and recording information, financial controls, and management practices, procedures and processes.

The Agreement also provides that "[t]he terms of Paragraphs 3 through 15 of this Agreement (including the State Specific Appendix) shall survive the termination of EMPLOYEE's employment with AEROTEK." The Agreement further contains a notice requirement that Murphy provide Aerotek at least 14 days' notice of any violation of the non-disclosure, non-compete and non-solicitation obligations. The Agreement contains a choice of law provision to apply Maryland law.

Murphy's employment with Aerotek was terminated on July 19, 2017. By the fact of his employment with Aerotek, and the knowledge he derived therefrom, Murphy took with him upon his resignation Aerotek's sensitive, confidential, proprietary and trade secret information. In particular, Murphy took with him knowledge regarding candidates' preferences, work and salary histories, Aerotek's clients, the contact persons of those clients, the idiosyncrasies of the clients/contact persons, the clients' recruiting/placement needs, and the account managers' assessment of the clients' future needs and plans for meeting those needs.

Beacon Hill is engaged in the business of recruitment and placement of employees to address clients' staffing needs. Beacon Hill competes in the same marketplace as Aerotek. Murphy became employed by Beacon Hill in the position of Financial Account Executive in August 2017.

As a Financial Account Executive, Murphy is responsible for driving profitability, networking with customers and prospects, developing contacts and relationships with customers and prospects in a position to use Beacon Hill's services, and satisfying staffing requirements that customers and prospects request.

Murphy's employment with Beacon Hill violates or has violated Paragraph 3 of the Agreement in that he has been working or has worked within the 50-mile radius of Aerotek's St. Louis office and is engaged in an aspect of Aerotek's Business in which he performed work during the two years prior to his termination.

Aerotek believes that Murphy's position with Beacon Hill as a Financial Account Executive in which he is responsible for the same or similar duties as in the Account Manager position he held with Aerotek, has caused or will cause the inevitable disclosure of Aerotek confidential and trade secret information in violation of the Agreement.

Murphy also has violated his Agreement by communicating with at least six (6) Aerotek customers with whom he did business on Aerotek's behalf during the two years prior to his separation for the purpose of entering into a competitive business relationship for Beacon Hill's benefit or reducing the business such customers conduct with Aerotek.

In the course of these wrongful solicitations, Aerotek believes Murphy has used and/or disclosed Aerotek's confidential and trade secret information, including, but not limited to, client contact information, for the purpose of furthering his interests at the expense of Aerotek.

Murphy failed to provide at least 14 days' notice to Aerotek, as required by the Agreement, of his violation of his restrictive covenant obligations.

Murphy's wrongdoing has caused and will continue to cause Aerotek irreparable damage in excess of $75,000, exclusive of interest and costs.

Aerotek further alleges that Beacon Hill has encouraged, approved and/or ratified Murphy's unlawful and improper actions and has done so without privilege

to do so. Aerotek believes Beacon Hill's business model is to hire employees from competitors for the purpose of exploiting the contacts they developed at the competitor to get new clients, disregarding competitors' contractual rights in protecting legitimate business interests.

Count I of Plaintiff's Complaint alleges a breach of contract claim against Murphy. Count II is brought for an alleged violation of the Missouri Uniform Trade Secrets Act against Murphy. Count III is a claim for violation of Defend Trade Secrets Act against Murphy and Count IV is a claim of tortious interference with Contract against Beacon Hill.

Plaintiff seeks injunctive relief and damages.

The temporary and preliminary injunctive relief sought by the Plaintiff is the same ultimate relief that it seeks in the Complaint, in addition to damages.

## Discussion

The Court has jurisdiction to resolve these issues under 28 U.S.C. § 1332.

"Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant, (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant, (3) the probability that movant will succeed on the merits, and (4) the public interest." *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th

Cir. 1981). The same factors govern a request for a temporary restraining order. *Roberts v. Davis*, 2011 WL 6217937, at *1 (E.D. Mo. Dec. 14, 2011). "No one factor is dispositive of a request for injunction; the Court considers all the factors and decides whether 'on balance, they weigh towards granting the injunction.'" *Braun v. Earls*, 2012 WL 4058073, at *1 (E.D. Mo. Sept. 14, 2012) (quoting *Baker Elec. Co-Op, Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994)).

"Although "no single factor is determinative," *Dataphase,* 640 F.2d at 113, the probability-of-success factor is the most significant, *see Home Instead, Inc. v. Florance,* 721 F.3d 494, 497 (8th Cir.2013)." *Sharpe Holdings, Inc. v. U.S. Dept. of Health and Human Services* 2015 WL 5449491, 4 (8th Cir. September 17, 2015)

In seeking a mandatory injunction that disrupts the status quo, the Plaintiffs "must demonstrate not only that the four requirements for a preliminary injunction are met but also that they weigh heavily and compellingly in their favor." *Blankenship v. Chamberlain*, 2008 WL 4862717, at *2 (E.D. Mo. Nov. 7, 2008) (quoting *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001)).

Plaintiff seeks the same, ultimate relief that it requests in its Complaint. "The purpose of a preliminary injunction is not to give the plaintiff the ultimate relief it seeks. It is . . . to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began." *WarnerVision Entm't Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259, 261-62 (2d Cir. 1996).

Plaintiff seeks a temporary restraining order and a preliminary injunction that orders Murphy to cease working for Beacon Hill and enjoins Murphy and Beacon Hill from soliciting its employees and its customers, and enjoins Murphy and Beacon Hill from using its proprietary and confidential information supplied or furnished by Murphy.

Both Aerotek and Beacon Hill are in the staffing industry and provide temporary and contract employees to work for customers or clients. They employ personnel in customer sales ("account managers") and in recruiting candidates to fill customers' needs ("recruiters"). At Aerotek, Murphy was a recruiter initially, and was promoted to account manager. He signed an Agreement pursuant to which he agreed, for a period of 18 months after terminating employment, not to solicit or attempt to hire other Aerotek employees, and not to compete with Aerotek in a new position in the staffing industry.

In its complaint and other materials supporting the temporary restraining order application, Aerotek asserts claims against Beacon Hill and Murphy for breach of contract (i.e., violation of the Agreements), tortious interference with contract and violations of the Missouri and Federal trade secrets acts. Essentially, the allegations are that the Agreement has been, and is continuing to be, violated through the employment of Murphy in competition with Aerotek (particularly his

contacts with Aerotek's present or past customers and recruits), and the use and disclosure by Murphy of Aerotek's trade secrets and confidential information.

The standard for issuance of the "extraordinary and drastic remedy" of a temporary restraining order or a preliminary injunction is very high, *see Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997), and by now very well established.

*Likelihood of Irreparable Harm*

"The threshold inquiry is whether the movant has shown the threat of irreparable injury." *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.,* 871 F.2d 734, 738 (8th Cir. 1989) (en banc). "The failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction . . . ." *Id.* Irreparable harm must be certain and imminent such that there is a clear and present need for equitable relief. *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996). Possible or speculative harm is not sufficient. *Local Union No. 884, United Rubber, Cork, Linoleum, & Plastic Workers of Am. v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1355 (8th Cir. 1995). When there is an adequate remedy at law, a preliminary injunction is not appropriate. *Modern Computer Sys.*, 871 F.2d at 738.

Aerotek has not met its very high burden here. Assuming the validity and enforceability of the Agreement, the evidence presently before the Court does not

clearly establish that Aerotek is suffering irreparable harm. Certainly Aerotek contends that Murphy has been soliciting other Aerotek employees and its customers, and has been using Aerotek trade secrets and other confidential information, all of which could violate the Agreements. But Murphy has firmly denied those contentions in his affidavit, and the record at this point does not plainly favor Aerotek's version of events. While the Court cannot resolve these core issues on Aerotek's present motion, it is enough that at this stage of the litigation Aerotek has not shown irreparable harm. There is no specific evidence, as yet, that Murphy actually acquired and has been utilizing protected Aerotek trade secrets or confidential information. Under the clear law in this circuit, the injury in support of extraordinary preliminary injunctive relief must be both certain and great; it must be actual and not theoretical, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm. Aerotek's alleged injury, however, remains at this time largely speculative, and far short of the certainty and imminence that is required. Specific, concrete and imminent claims of injury simply have yet to be established. Given this history, Aerotek has not made on the current record the clear showing of irreparable harm that will support the extraordinary injunctive relief it seeks. According to Murphy's affidavit, the information used in the staffing industry is readily available to

anyone who seeks the information through the internet, calls to prospective clients and cold calls.

In so concluding, the Court does not intend to offer any firm assessment of irreparable harm, or the overall balance of harms, other than to conclude that at this time Aerotek has not met its burden on irreparable harm. If defendant is ultimately shown to be in breach of the Agreement or otherwise liable on Aerotek's claims, those are serious matters that could warrant the conclusion that Aerotek is entitled to damages.

At no point has Plaintiff presented any concrete evidence of harm warranting injunctive relief. Where "[t]he possible harm identified is wholly speculative . . . it cannot be called irreparable harm." *Local Union No. 884 v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1355 (8th Cir. 1995).

More significantly, Plaintiff's alleged harm is not irreparable, as there are other causes of action wherein money damages are a potential form of relief. *Alternative Med. & Pharmacy, Inc. v. Express Scripts, Inc.*, 2014 WL 4988199, at *7 (E.D. Mo. Oct. 7, 2014) ("[T]he harm is purely economic and therefore not irreparable.").

### *Likelihood of Success on the Merits*

Although at first blush it appears that Plaintiff has a compelling argument that Murphy has breached the Employment Agreement, his affidavit reveals that he

is not performing the same work as he did with Aerotek. Further, he avers he has not taken any trade secrets or confidential information, nor has he downloaded any of Aerotek's password protected information. This matter is not yet ripe for factual determinations regarding the actions Murphy took or did not take and whether the information was obtained from Murphy's work at Aerotek or whether he acquired information through publically available means.

*Public Interest*

The public interest favors both sides in this controversy. The integrity of valid employment agreements must be maintained, while by the same token, the public interest disfavors restraints on one's ability to practice his or her trade.

*Balance of Harms*

Because Plaintiff seeks the ultimate relief it demanded in the Complaint, Defendants will be harmed by the loss of its right to trial. Plaintiff, on the other hand has failed to present evidence that monetary damages will not make it whole in the event a breach has been established.

## Conclusion

The Court has considered the entire record and the arguments presented at the hearing on this matter. Based upon the foregoing consideration of all of the *Dataphase* factors, Plaintiff's demand for mandatory and ultimate relief and failure

to establish irreparable harm, Plaintiff is not entitled to a temporary restraining order or a preliminary injunction.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for a Temporary Restraining Order, [Doc. No. 2], is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for a Preliminary Injunction, [Doc. No. 2], is **DENIED**.

Dated this 16th day of October, 2017.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE